# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

| | |
|---|---|
| **KATHERINE REEVES,** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | )    **Case No. 1:12-cv-00018** |
| **v.** | )    **Judge Aleta A. Trauger** |
| | ) |
| **TENNESSEE FARMERS MUTUAL** | ) |
| **INSURANCE COMPANY, INC.,** | ) |
| | ) |
|     **Defendant.** | ) |

## MEMORANDUM

The defendant, Tennessee Farmers Mutual Insurance Company, Inc. ("TFMIC"), has

filed a Motion for Summary Judgment (Docket No. 15), to which the plaintiff, Katherine Reeves,

filed a Response in opposition (Docket No. 19), and TFMIC filed a Reply (Docket No. 23). For

the reasons stated herein, TFMIC's Motion for Summary Judgment will be granted.

## BACKGROUND[1]

---

[1]TFMIC has filed a Statement of Undisputed Material Facts (Docket No. 17) ("TFMIC's SUMF"), supported by excerpted deposition transcripts (Docket No. 15, Exs. A (Reeves), B (Martin), C (Garrett), D (Otey), E (McDonald), F (Bowling), G (Delk)), an Affidavit of Julie Bowling (*id.*, Ex. H.), and excerpted interrogatory responses of TFMIC (*id.*, Ex. I), along with a subpoena response from a third party (Ex. J). Reeves filed a Response to TFMIC's SUMF (Docket No. 21), which includes objections to certain of TFMIC's factual representations. Reeves also filed deposition excerpts in support of her motion (*see* Docket No. 20, Attachment Nos. 1 (Delk), 2 (Reeves), 3 (Martin), 4 (Bowling), 5 (Garrett), 6 (Burns), and 7 (McDonald), and a Declaration of Katherine Reeves (*id.*, Attachment No. 8.). Reeves did not file any separate statement of facts pursuant to Rule 56.01(c), choosing instead to reference additional facts in the excerpted materials filed in support of her motion, some of which overlap with materials filed by the defendant. TFMIC has not objected to Reeves' approach in this regard. Therefore, unless otherwise noted, the facts are drawn from TFMIC's SUMF, Reeves' responses thereto, and Reeves' additional references to undisputed facts in the record, drawing all reasonable inferences in favor of Reeves. In certain instances noted herein, the court has also drawn additional facts from materials in the record pursuant to Fed. R. Civ. P. 56(c)(3).

1

## I.     Open PCR Position

TFMIC's regional claims office in Waynesboro, Tennessee is staffed by Claims

Assistants, Property Claims Representatives ("PCRs" or "adjusters"), Auto Field Claims

Representatives, and a Regional Claims Manager.  TFMIC originally hired the plaintiff, Reeves,

as a Claims Assistant in the Waynesboro office in April 2006.[2]

In December 2010, a PCR position came open in the Waynesboro office.  Relative to

Reeves' position as a Claims Assistant, moving to the PCR position would constitute a

promotion.  The Regional Claims Manager at the time, Mike Delk, was responsible for filling the

PCR position.  TFMIC gave Delk essentially unfettered discretion in deciding whom to hire, and

provided him no written guidelines or criteria with which to evaluate applicants.

Reeves applied for the open PCR position on or about January 17, 2011.  During the time

frame in which Reeves applied for the position, Delk made gender-based discriminatory

comments, expressing to Reeves that he would not hire a woman as a PCR because of "safety"

concerns and/or his bad experiences with three previous female PCRs.  Delk also contacted other

Regional Claims Managers to determine whether the female PCRs had performed differently

than male PCRs.

Out of multiple applicants, Delk interviewed nine candidates in late January 2011,

including Reeves and eight males.  Delk then narrowed the field of candidates to Reeves and

Greg Martin, an external male applicant.  Delk conducted second-round interviews of both

_____

[2]In one document in the record, discussed herein, Reeves referred to the Claims Assistant
position as a "secretary."  (*See* Docket No. 20, Attachment No. 2, Ex. 25 to Reeves Dep., 4/25/11
Letter from Reeves to Mike Delk.)  At any rate, as a Claims Assistant, Reeves was responsible
for, *inter alia*, answering phones, entering checks, taking dictation, and otherwise assisting
adjusters.

candidates. During his interview of Reeves, Delk stated that Reeves had "brought [Delk] over from the dark side," purporting to reflect Delk's change of heart as to whether a woman could work as a PCR. In January 2011, after that interview and while Delk was still considering whether to choose Martin or Reeves, Reeves received a call at work about a personal situation involving her daughter. Reeves raised her voice during this conversation. There is conflicting testimony as to whether Reeves made additional calls concerning this personal issue that morning. At any rate, Delk testified that, having observed Reeves' reaction to the call(s) that morning, he believed that it would be inappropriate to hire a PCR who would let a personal issue affect her ability to do her job. Reeves vigorously disputes that she "overreacted" to the call, that she made additional calls that morning, and, regardless, that her conduct that morning could have justified Delk's purported basis for choosing Martin instead of her. On February 2, 2011, soon after this incident, Delk made a conditional offer to Martin, pending a background check and approval from TFMIC's home office.[3]

After Delk informed Reeves that he had offered the position to Martin instead of her, Reeves called Byron Garrett, Vice President of Claims for TFMIC. In that conversation, Reeves recounted Delk's discriminatory comments and urged TFMIC to review Delk's decision-making process. Garrett immediately spoke with Delk, who confirmed Reeves' account of events, including the fact that he had made discriminatory comments. Garrett placed a hold on Martin's conditional offer and met with TFMIC General Counsel Ed Lancaster and Assistant General

---

[3]There are genuine disputes of fact as to how Reeves reacted on February 2, 2012, and whether that would have justified Delk's decision. Reeves also disputes whether the results of the background check would actually have impacted TFMIC's conditional offer to Martin. These factual disputes are immaterial because, as explained herein, Martin was not ultimately hired for the position.

Counsel Julie Bowling. There is conflicting testimony as to whether Garrett, Lancaster, or Bowling spoke with Delk about the incident during that meeting. At any rate, within two days of receiving Reeves' complaint about Delk's decision, Garrett, Lancaster, and Bowling decided to rescind Martin's conditional offer and to reopen the hiring process for the PCR position.

In the re-opened hiring process, Delk had no involvement or input. Lancaster and Bowling enlisted TFMIC Assistant Vice President Rick McDonald to assist them in the interviewing process. TFMIC reviewed the applications from previous applicants (including Reeves) and two additional applicants not previously considered by Delk, including internal female applicant Takashli Otey.[4] McDonald and Bowling scheduled six applicants for interviews, including Reeves, and interviewed these candidates on February 9, 2011. Reeves did not make a good impression on McDonald and Bowling during her interview. McDonald felt that Reeves seemed anxious and gave answers that were difficult to follow. Bowling felt that Reeves gave rambling answers to questions and was unnecessarily critical of her coworkers.

After weighing several factors, including the applicants' claims adjusting experience, the applicants' tenure at TFMIC (if any), their reviews from supervisors, and their respective interview performances, McDonald and Bowling each ranked the top three candidates. Independently, they both ranked Bryan Bone first (male), Takashli Otey (female) second, and Greg Martin (male) third. After learning that Bone was no longer interested in the PCR position, McDonald and Bowling offered the position to Otey, who accepted it. With the exception of a six-month period in which she left work to be with her children, Otey had worked for TFMIC

---

[4]It appears that Ms. Otey had attempted to apply for the PCR position when Delk was responsible for filling it but did not submit her application within the time frame Delk had set. (*See* Docket No. 15, Ex. I, at TFMIC Resp. to Interrogatory No. 6; Docket No. 20, Ex. 4, Bowling Dep. at 44:13–19.)

since 2003, when she was hired for a data entry position, and had worked as an "Office Claims Representative" ("OCR") at TFMIC for the three years preceding her interview with McDonald and Bowling. McDonald and Bowling believed that Otey had gained valuable experience as an OCR and that she made a good impression during her interview. Otey had also received a positive recommendation from her supervisor and was otherwise qualified for the position.

Reeves admits that TFMIC did not discriminate on the basis of gender in choosing to hire Otey as part of the re-opened hiring process. Reeves also admits that Otey was otherwise qualified for the position. However, Reeves argues that TFMIC is liable for (1) gender discrimination as a result of Delk's (ultimately rescinded) decision to hire Martin for the PCR position, and/or (2) retaliation for utilizing, in the re-opened hiring process, "different non-gender-related selection criteria than had been used by Delk in making his decision." (*See* Docket No. 19, Pltf. Resp. at p. 17.)[5]

## II.    Alleged Post-Complaint Harassment

Reeves argues that, after she (successfully) complained to management about Delk, she was subjected to workplace harassment. Before she complained, she was treated kindly by her coworkers and included in social activities.

However, approximately two days after TFMIC announced that Otey would be filling the OCR position, Reeves saw Delk invite David Parsons, one of the three adjusters whom Reeves

---

[5]As recounted in TFMIC's SUMF, Reeves unsuccessfully applied for another PCR position that opened up in January 2012. TFMIC hired a qualified female, Sara Moore, for that position. Reeves also sought a promotion as an Auto Field Claims Representative, but TFMIC filled the position with a qualified male candidate, Bryan Bone. In her Response brief, Reeves does not address or even reference her subsequent unsuccessful applications for these positions, let alone argue that TFMIC's decisions with respect to these two applications were discriminatory and/or retaliatory. Therefore, the court construes Reeves as conceding that her later applications for promotion are not relevant for purposes of the instant motion.

generally assisted, into his Delk's office.  Following that meeting, to which Reeves was not

privy, she claims that "everything changed in the office."  (Reeves Dep. at 154:11-12.)  Initially,

she complained to TFMIC about the following conduct in March and April 2011[6]:

- Her coworkers excluded her from all social conversations, although she stated at deposition that this "was fine" because it was "not part of the daily work." (*Id.* at 156:11.)

- The three adjusters for whom she worked – Parsons, Billy Thomas, and Ray Kuykendall – treated her disrespectfully by being "short," "condescending," and "unprofessional."  At deposition, Reeves could not articulate any specific examples in which Thomas acted condescendingly towards her, but she did reference one example as to Kuykendall and several examples relative to Parsons, as described herein.

- On March 11, 2011, when the other Claims Assistant, Kim Wright, was out of the office, Reeves was left as the only "secretary" responsible for answering phones.  She complained that, on that day, no one offered to cover for her while she took lunch or went to the restroom.  In the past, employees typically had "offered or gone above and beyond to try to help me." (Reeves Dep., Ex. 25.)

- On March 14, 2011, Parsons criticized Reeves verbally for having a loud voice.  Parsons also asked her about a particular insured, became upset with her, and stated "Well, whatever, I will just have to do it myself."

- On March 24, 2011, Delk did not ask her to hand out paychecks to the other employees, a task he typically delegated to her on "paydays."

_____

[6]After Reeves made generalized complaints of harassing conduct to Bowling on April 6, 2011, Bowling provided Reeves with copies of TFMIC's anti-discrimination/anti-harassment policy and TFMIC's grievance procedure.  (Reeves Dep., Ex. 20.)  Bowling urged Reeves to speak with her supervisor first, as set forth in the policy; Bowling also urged Reeves to provide a written description of any alleged instances of unlawful harassment or discrimination.  Reeves did not provide a written description on that date.  On April 18, 2011, Bowling followed up, indicating that she had not heard anything further from Reeves and again asking Reeves to provide a written description of any alleged incidents of harassing or discriminatory conduct.  Reeves initially responded by forwarding an email that Parsons had sent on April 17, 2011 (the day before Bowling's follow-up email), which Reeves contended was harassing.  On April 25, 2011, Reeves finally provided TFMIC a written description of her complaints to that point. (Reeves Dep., Ex. 25.)  Some of the examples listed herein are drawn from that April 25, 2011 letter, in addition to other sources in the record.

Instead, Delk permitted Parsons to handle this task on that particular day, at which point Reeves emailed Delk to complain. Reeves testified that Delk told Reeves something to the effect of, "Now *you* know what it feels like to have something taken away that you're responsible of [sic]." (Reeves Dep. at 166:1-3) However, at deposition, Reeves admitted that (1) she did not in fact have any job responsibilities taken away from her as a result of this single occurrence (*id.* at 166:14-16); and (2) this single occurrence "didn't interfere" with her ability to do her job (*id.* 164:13-18).[7]

- In general, Reeves' coworkers allegedly treated her differently when Delk was not around. However, Reeves believes that Delk did not direct them to mistreat her.

- On April 6, 2011, Delk was out of the office when a storm hit, causing numerous claims to be filed. Delk emailed Reeves and Wright, indicating that they would be assisting the adjusters that day to deal with the increased call volume. After Reeves offered to help Parsons, Parsons openly criticized her (verbally) and then accosted her separately, telling her that "you'll do what I tell you, when I tell you." (Reeves Dep. at 159:10-25.) Also, Reeves became offended when Parsons did not solicit input from her or assign her sufficient work that day; instead, Parsons delegated his work that day to Wright, the other Claims Assistant. Both Reeves and Parsons raised their voices towards each other.

- On April 15, 2011, while Delk was away, Reeves emailed Parsons to inform him that she intended to leave early that day because she did not feel well. Two days later, Parsons attempted to email Delk to voice displeasure with Reeves' decision to leave that day, although Parsons accidentally sent his email to Reeves. At deposition, Reeves did not identify any false information in Parsons' email, nor did she identify any adverse consequences she suffered as a result of that email.

Reeves' April 25, 2011 letter also stated that Delk "apologized for how the office has been" and told her that "he was mad that I challenged him about his hiring decision and that was just how he reacted." (Reeves Dep., Ex. 25.)

After receiving Reeves' written explanation of these complaints, TFMIC investigated the

---

[7]Reeves also admitted that Delk told her that, in that instance, Delk had utilized Parsons to handle passing out paychecks because Parsons was looking for something particular in the mail that day.

allegations by speaking with Delk, Parsons, Thomas, and Kuykendall. On May 16, 2011, Bowling (in-house counsel for TFMIC) sent a short letter to Reeves, explaining that the company did not regard the alleged conduct as constituting "unlawful retaliation or harassment." (Reeves Dep., Ex. 26.) Bowling's letter also reported that "the investigation revealed that unprofessional statements or raised voices may have been used by both you and your coworkers," advising that "all individuals involved, including you [Reeves], are being advised to keep work communications between employees respectful and professional." (*Id.*) Reeves did not discuss this letter any further with Bowling, Delk, Parsons, or Garrett. (*Id.* at 198:17-199:10.) At deposition, Reeves admitted that she and her coworkers had in fact made unprofessional statements and/or raised their voices – *i.e.*, that Bowling's statements were accurate. (*Id.* at 198:4-7 ("Q: So the statement that unprofessional statements or raised voices may have been used by you and your co-workers was accurate, wasn't it? A: Yes, sir.").) On July 29, 2011, Reeves emailed Delk to complain that Kuykendall was "very condescending and short" with her with respect to a particular question she had asked of him, that he was "hateful and disrespectful" towards her, and that he "continuously has an issue with me." (Reeves Dep., Ex. 27.) At deposition, Reeves could not recall whether Kuykendall continued to treat her in an allegedly disrespectful manner after the date of this email to Delk. (*Id.* at 202:14-16.) Furthermore, she admitted that Kuykendall was not "hateful" or "disrespectful" towards her in front of Delk. (*Id.* at 202:17-19.)

On September 12, 2011, Reeves emailed Delk to complain about the adjusters again. (Reeves Dep., Ex. 28.) Although the email is not a model of clarity, from Reeves' testimony it appears that she sought to report that (1) individuals in the office were not timely keeping her

informed of scheduled absences, leading her, at times, to transfer incoming calls to individuals who were actually out of the office; (2) that the adjusters were giving more work to Wright (the other Claims Assistant) than to her; and (3) that the adjusters continued to be "unprofessional" when she asked them questions. The email states that the adjusters' conduct "is usually worse when you [Delk] are not around," and that the adjusters "choose not to listen to you [Delk] and do their own thing." Delk emailed back to state that he would keep her informed about scheduled absences and told her that, "if there is a particular incident where someone is not treating you professionally, then please let me know so I can address it." Reeves did not recall responding to Delk's suggestion in this regard. (Reeves Dep. at 210:3-4.) Also, at deposition, Reeves admitted that, notwithstanding her complaints about workflow, she was never criticized for failing to do her work or for failing to do a sufficient amount of work. (*Id.* at 208:16-20.)

On October 7, 2011, Delk emailed Reeves to ask her to "lower your volume" on the telephone, because he could hear her in his office several feet away. (Reeves Dep., Ex. 29.) Reeves admits that, in speaking to someone on the phone that day, she "got excited." Nevertheless, she believed that Delk unfairly asked her to lower the volume of her voice, because men in the office often raised their voices on the phone. However, at deposition, she admitted that she had no knowledge as to whether Delk had ever asked others in the office to lower their voices. (*Id.* at 213:21-214:2.)

On or about October 25, 2011, Delk went to Reeves' office and, standing the doorway of her office, told her that she was receiving a pay raise. Thereafter, Reeves emailed Delk to complain that, unlike with respect to previous pay raises he had given her, in this instance he did not call her into his office and discuss her work performance in connection with the raise.

Reeves admitted that Delk had also told Wright (the other Claims Assistant) about the pay raise in the same manner. (*Id.* at 219:5-7.)

In her response brief, Reeves has not referenced any specific instances of alleged harassment occurring after October 2011. It appears that Delk ceased working as the Regional Claims Manager in early 2012. (*See* Delk Dep. at 8:4-6 (taken Oct. 30, 2012) (stating that he had worked in a different capacity for the "last six months")).

**III.**     **Reeves' Claims**

Reeves contends that TFMIC is liable for gender discrimination and/or retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.* ("THRA").

**SUMMARY JUDGMENT STANDARD**

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2013). At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its burden by showing that there is an absence of evidence to support the non-moving party's case. *Id.* (citing *Celotex*, 477 U.S. at 325). "When the moving party has carried this burden, 'its opponent must do more than simply

show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).) The non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Id.*

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587). But "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient," *Moldowan*, 578 F.3d at 374 (quoting *Anderson*, 477 U.S. at 252), and the non-movant's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249. An issue of fact is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).

## ANALYSIS

### I.  Title VII and THRA Claims Analysis

Claims under Title VII and the THRA are subject to the same evidentiary standards. *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 464 (6th Cir. 2001); *Jackson v. Bd. of Educ. of Memphis City Schs. of Memphis, Tenn.*, 494 F. App'x 539, 543 n.1 (6th Cir. 2012); Tenn. Code

Ann. 4-21-331(e).[8]  Therefore, the court's analysis and conclusions concerning the Title VII

claims apply equally to the parallel claims brought under the THRA.  *See Wade*, 259 F.2d at 464;

*Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001); *Jackson*, 494 F. App'x at 543

n.1; *see also Miller v. City of Murfreesboro*, 122 S.W.3d 766, 775 (Tenn. Ct. App. 2003).

## II.     Discriminatory Failure to Promote Claim

### A.     Applicable Standard

A plaintiff may prove gender discrimination by introducing direct evidence of

discrimination or circumstantial evidence that would support an inference of discrimination.

*Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000).  Direct evidence of

discriminatory intent is "evidence which, if believed, . . . requires the conclusion that unlawful

discrimination was at least a motivating factor in the employer's actions."  *Jacklyn v. Schering-*

*Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).  Such evidence does

not require any inferences to be made in order to conclude that the challenged employment

action was motivated, at least in part, by discriminatory animus against members belonging to a

protected group.  *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).  Once an employee

shows that unlawful discrimination was a motivating favor in the adverse employment action,

"the burden of both production and persuasion shifts to the employer to prove that it would have

---

[8]In 2010, the Tennessee Supreme Court announced that the *McDonnell Douglas* framework was not appropriate for Tennessee courts to apply to THRA claims at the summary judgment stage, *see Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 799 (Tenn. 2010), thereby creating some ambiguity as to which summary judgment standard should apply to THRA claims in federal cases.  However, in 2011, the Tennessee legislature effectively abrogated *Gossett* by clarifying that burden-shifting was appropriate for THRA claims, thereby mooting the issue.  *See Johnson v. Metro Gov't of Nashville & Davidson Cnty., Tenn.*, Nos. 10-6102, 11-5174, 2012 WL 4945607, at *19 (6th Cir. Oct. 18, 2012) (citing *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 757 (6th Cir. 2012)).

[undertaken the same action] even if it had not been motivated by impermissible discrimination." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Under the circumstantial evidence approach, the *McDonnell Douglas* burden-shifting framework is employed. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007). First, the plaintiff must produce evidence to establish a *prima facie* case. *Caterpillar*, 496 F.3d at 593. To establish a *prima facie* case of gender discrimination for failure to promote, the plaintiff must demonstrate that (1) she was a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions. *Allen v. Mich. Dep't of Corrections*, 165 F.3d 405, 410 (6th Cir. 1999). If the plaintiff makes out her *prima facie* case, "the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision." *Clay v. United Parcel Serv.*, 501 F.3d 695, 703-704 (6th Cir. 2007); *Carter v. Univ . of Toledo*, 349 F.3d 269, 273-74 (6th Cir. 2003). If the defendant meets its burden of articulation, the burden shifts back to the plaintiff to show that the reason put forth by the defendant is pretextual . . . ." *Clay*, 501 F.3d at 703-704; *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

**B.    Application**

Reeves argues that TFMIC became liable to her for gender discrimination when Delk issued a conditional offer of employment to Martin, even though TFMIC quickly rescinded that offer after the plaintiff's complaints. If this case turned on whether Delk discriminated on the basis of gender in issuing a conditional offer to Martin, it would present a triable fact issue for

the jury, on both a direct evidence theory (in light of Delk's discriminatory comments about hiring women as PCRs) – and a circumstantial evidence theory (given that Delk selected a male over Reeves in a hiring process arguably unconstrained by any objective criteria).

However, it is undisputed that Martin *did not fill the PCR position* and that, instead, TFMIC *promoted* a *female* to the position. That is, TFMIC rescinded Delk's conditional offer to Martin, re-opened the hiring process, employed gender-neutral selection criteria in the re-opened process, and hired a qualified female for the PCR position. Therefore, whether Delk discriminated in extending a conditional offer to Martin in the initial application process is beside the point; the relevant inquiry is whether TFMIC ultimately discriminated on the basis of gender in filling the PCR position as part of its re-opened hiring process – and it is undisputed that it did not.

Thus, Reeves has offered no direct evidence of discrimination and cannot establish that a similarly situated member outside her protected class (*i.e.*, a male) was actually promoted to the PCR position, thereby failing her *prima facie* burden on a circumstantial evidence theory. Moreover, even if Reeves could somehow meet her *prima facie* burden, TFMIC has shown through unrebutted testimony that it utilized legitimate, non-discriminatory criteria in selecting Ms. Otey for the PCR position, including her work experience, her positive interview performance, and the positive recommendation from a supervisor. Ultimately, the court agrees with the defendants that Title VII did not strip TFMIC of the right to make business judgments in deciding whom to promote, nor did it require TFMIC to promote Reeves (instead of a different *female* applicant) as soon as it decided to rescind the offer to Martin. *See Wilkins v. Eaton Corp.*, 790 F.2d 515, 521 (6th Cir. 1986) ("The factfinder may not focus on the soundness

of the employer's business judgment . . . ."); *Smith v. Leggette Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) (finding that "it is inappropriate for the judiciary to substitute its judgment for that of management"); *Adams v. Tenn. Dep't of Fin. & Admin.*, 179 F. App'x 266, 272 (6th Cir. 2006) ("Courts are not intended to act as super personnel departments to second guess an employer's facially legitimate business decisions.") Indeed, consistent with Title VII's prohibition against gender discrimination in hiring, TFMIC ultimately chose a qualified female for the PRC position based on legitimate, non-discriminatory criteria, thereby effectuating the statute's purposes.

**III.**    **<u>Retaliation Claims</u>**

Title VII forbids an employer from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a) (2011); *see Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008). Title VII's anti-retaliation provision "seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms." *Burlington N. & Sante Fe Railway Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405 (2006) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997)).

Here, Reeves essentially articulates two theories of retaliation. First, she argues that the TFMIC's decision to re-open the hiring process was itself "retaliatory." Second, she argues that, after she complained about Delk's decision, other employees retaliated against her in multiple ways. As explained herein, both theories of liability are without merit.

    **A.**     **Retaliatory Non-Discriminatory Hiring Process Theory**

Claims of retaliation also proceed under the *McDonnell Douglas* burden-shifting framework. *Imwalle*, 515 F.3d at 543. To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) the employee has engaged in Title-VII protected activity; (2) the employer had knowledge of this fact; (3) the employee suffered an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment claim. *Imwalle*, 515 F.3d at 544. Once the plaintiff has established her *prima facie case*, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employer's actions. *Id.*; *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004). If the defendant satisfies this burden, the plaintiff must then demonstrate by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but instead was a pretext designed to mask retaliation for engaging in the protected activity. *Id.* A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct. *Manzer*, 29 F.3d at 1083; *Imwalle*, 515 F.3d at 545. "Regardless of which rebuttal method is employed, the plaintiff retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[] intentionally discriminated against [her]." *Imwalle*, 515 F.3d at 545 (quoting *Johnson v. Kroger Co.*, 389 F.3d 858, 866 (6th Cir. 2003)); *Manzer*, 29 F.3d at 1083 ("The jury may not reject the employer's explanation, unless there is a sufficient basis in the evidence for doing so.").

Here, in a peculiar line of argument, Reeves claims that TFMIC "retaliated" against her when it chose to re-open the hiring process using "different non-gender-related selection criteria

than had been used by Delk in making his decision." (Docket No. 20, Pltf. Resp. at p. 17.) Essentially, she argues that TFMIC was obligated to promote her as soon as it ascertained that Delk may have discriminatorily chosen Martin over her for the PCR position based on gender – *i.e.*, an unlawful consideration.

Tellingly, Reeves' argument does not reference the statutory elements of a retaliation claim under the *McDonnell Douglas* framework, nor has she identified any case in which a court has found that an employer is precluded from conducting a non-discriminatory hiring process after it rescinds a previous discriminatory hiring decision that was *never implemented*. Indeed, this theory of retaliation fails for multiple reasons. First, Reeves has failed to establish a *prima facie* case of retaliation, because TFMIC's decision to re-open the hiring process was not itself an "adverse employment action." A plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in the context of a retaliation claim means "it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68 (internal quotation omitted). Here, Reeves was simply placed back into the applicant pool and allowed to re-interview for a position that she had not been offered in the first place. Under the circumstances, a reasonable employee would not have found TFMIC's decision to re-open the hiring process to be "materially adverse." More fundamentally, TFMIC's actions would not have dissuaded a reasonable worker from making or supporting a charge of discrimination under Title VII as Reeves did. To the contrary, TFMIC's response to Reeves' complaint would encourage victims of discrimination in its offices to come forward: TFMIC responded quickly to Reeves' complaint and reported the matter to higher levels of management and in-house counsel, rescinded implementation of a potentially

discriminatory decision by a mid-level supervisor, isolated that supervisor from the hiring process, and conducted a non-discriminatory hiring process for the open position, resulting in the hiring of a qualified female.

Second, even if re-opening the application process somehow could be construed as an adverse action, Reeves has not presented evidence demonstrating that TFMIC intentionally discriminated against her in retaliation for raising concerns about gender discrimination in the hiring process. Indeed, she concedes that McDonald and Bowling considered only legitimate, *non-discriminatory criteria* in selecting Otey, including Otey's broader work experience at TFMIC, previous reviews, and tenure at TFMIC, which exceeded Reeves' tenure by about three years. Thus, Reeves cannot show pretext.

Accordingly, even construing the facts in the light most favorable to Reeves, the undisputed facts show that TFMIC made a reasoned business decision to promote Otey, a qualified female, to the open PCR position. There is no evidence indicating that TFMIC promoted Otey as a means of *retaliating* against Reeves for reporting potential gender discrimination by Delk. Absent such evidence, this retaliation theory must fail.

### B.    Workplace Harassment as Retaliation

Based on its own research, the court has determined that the Sixth Circuit recognizes retaliation claims under three circumstances: (1) where the plaintiff suffered from some type of adverse employment action (as discussed above); (2) where the plaintiff was subject to retaliatory harassment by a supervisor; and (3) where the plaintiff suffered from retaliatory harassment by coworkers. *See Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (adverse employment action and retaliatory harassment by supervisor); *Hawkins v.*

*Anheuser Busch, Inc.*, 517 F.3d 321, 346 (6th Cir. 2008) (coworker retaliation). Here, the parties

have characterized Reeves' remaining retaliation claims as articulating a "retaliatory

harassment" theory,[9] but neither party cites to the Sixth Circuit standards for supervisory

harassment and/or coworker harassment. Perhaps for this reason, the parties have not briefed

whether the adjusters about whom Reeves has complained – Parsons, Kuykendall, and Thomas –

were her "supervisors" or her "coworkers" for purposes of a retaliatory harassment claim.

Without deciding that issue, the court will analyze Reeves' claims under both of those

harassment retaliation standards, as well as the traditional retaliation standard.

### 1. Retaliation by Adverse Employment Action

In *Morris*, the Sixth Circuit clarified that a plaintiff may establish that she suffered from

"retaliatory harassment" from a supervisor by establishing the following *prima facie* elements:

(1) she engaged in protected activity; (2) this exercise of protected rights was known to

defendant; (3) the plaintiff was subject to an adverse employment action or "severe or pervasive"

retaliatory harassment by a supervisor; and (4) there was a causal connection between the

protected activity and the harassment. 201 F.3d at 792.

Reeves has not shown that she suffered from an adverse employment action after she

complained about gender discrimination by Delk. She does not contend that she was

discriminatorily denied a subsequent promotion, that TFMIC reduced her pay (in fact, it appears

that TFMIC raised it), that she was disciplined or otherwise counseled by her supervisors, that

she suffered some material loss of benefits, or that she was transferred, demoted, or formally

---

[9]*See, e.g.*, Pltf. Resp. at p. 18 ("The Evidence is Sufficient to Establish Plaintiff's
Harassment Claim"); Docket No. 23, Def. Reply at p. 4 ("Reeves does not identify a single
materially adverse employment action to support her claim for retaliatory harassment."))

stripped of certain core job responsibilities. In the absence of any concrete adverse action taken by TFMIC and/or Reeves's supervisors, the court finds that Reeves has not met an essential element of her *prima facie* burden for this type of retaliation theory. *See Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593-94 (6th Cir. 2007); *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999) ("[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished job responsibilities, or other indices that might be unique to a particular situation.") (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993)); *Weigold v. ABC Appliance Co.*, 105 F. App'x 702, 708 (6th Cir. 2004) ("A formal reprimand may constitute adverse employment action but, absent evidence that it is anything more than mere criticism, a verbal reprimand does not.") (internal quotation and brackets omitted).

2.    Supervisory Retaliation[10]

With respect to a retaliatory harassment claim, Reeves has shown that she engaged in protected activity, the record indicates that TFMIC, Delk, and Parsons knew about this activity, and there is at least a triable issue of fact as to whether the close temporal proximity between Reeves' complaint and her coworkers' changed attitudes – which Delk himself acknowledged – established the requisite causal connection. However, even construing the facts in the light most

---

[10]For purposes of this section, the court will assume that Delk and the adjusters were Reeves' "supervisors."

favorable to Reeves, she has not presented evidence establishing a genuine issue of material fact as to whether the alleged conduct amounted to "severe or pervasive retaliatory harassment," an essential element of her *prima facie* case for supervisory harassment. *See Morris*, 201 F.3d at 792; *see also Akers v. Alvey*, 338 F.3d 491, 498 (6th Cir. 2003) (summary judgment appropriate, where plaintiff failed to present genuine issue of material fact as to whether alleged retaliatory conduct by supervisor was sufficiently "severe or pervasive").

The standard for "severe or pervasive" harassment is the same in the retaliation context as in the sexual and racial discrimination contexts. *Akers*, 338 F.3d at 498. "Under that standard, the harassment must be 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). The test has both an objective and subjective component: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as hostile or abusive. *Akers*, 338 F.3d at 488. In undertaking its analysis, the "court must consider the totality of the circumstances an employee faces, including 'the frequency of the . . . conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Broska v. Henderson*, 70 F. App'x 262, 269 (6th Cir. 2003) (quoting *Harris*, 510 U.S. at 13).

Here, it appears that Reeves subjectively believes that the allegedly harassing conduct was hostile and abusive. Indeed, she seems to have regarded even minor criticisms, particularly from Parsons, as "harassing" conduct. However, a reasonable person would not have found the

conduct of which Reeves complains to be hostile or abusive.  Reeves has identified only a handful of sporadic incidents between March 2011 and October 2011 that she believes involved harassing conduct by the adjusters.  These incidents largely involved minor issues, and none unreasonably interfered with her job performance.  For example, Parsons apparently disapproved when Reeves left early on a particular day in March 2011, but he let Reeves leave early anyway and she suffered no adverse consequences.  Similarly, when Delk did not delegate to Reeves the responsibility to pass out paychecks on one particular day in March 2011, Reeves suffered no adverse consequences other than her subjective hurt feelings.  Also, Reeves appears to have been subjectively upset by Parsons' decision to run more of his assignments through the other Claims Assistant, Wright, but Reeves has articulated no adverse consequences to her employment status, other than the fact that she is otherwise an "asset" to the company and feels that her talents were being underutilized during that time frame.  Finally, Reeves' complaints about not being kept in the loop on scheduled absences was trivial, inconsequential, and, at any rate, ultimately addressed by Delk.

The worst conduct of which Reeves complains is the rudeness and condescension with which other adjusters, particularly Parsons, treated her.  She essentially complains that she felt intimidated to ask them questions and felt that they were being unprofessional to her, including Parsons' directive, on a single occasion, that Reeves do only the work he told her to do.  Whether or not these feelings were justified during the short time frame about which Reeves complains, these forms of rudeness – for which Reeves provides few specifics – were not severe and were not pervasive.  Title VII is not a "general civility code" for the workplace.  *Faragher*, 524 U.S. at 788.

Consistent with this court's conclusion, the Sixth Circuit has found that conduct objectively worse than that identified here was insufficiently "severe or pervasive" for purposes of a Title VII harassment claim. *See, e.g., Akers*, 338 F.3d at 499 (supervisor ignoring plaintiff, encouraging others to ignore plaintiff, criticizing her work, and withholding her mail not sufficient); *Broska*, 70 F. App'x at 270 (supervisor ignored employee, encouraged coworkers to ignore employee, criticized her work, and withheld her mail); *Willey v. Slater*, 20 F. App'x 404, 405 (6th Cir. 2001) (co-worker ostracism and "openly negative and hostile" attitude by supervisor insufficient); *Ceckitti v. City of Columbus*, *Dep't of Public Safety, Div. of Police*, 15 F. App'x 512, 518 (6th Cir. 2001) ("Just as conduct must be 'extreme' to amount to a change in the terms and conditions of employment, it must also be extreme to constitute severe and pervasive retaliatory harassment."); see *also Blackburn v. Shelby Cnty.*, 770 F. Supp. 2d 896, 930 (W.D. Tenn. 2011) (generalized complaints of "constant needling and criticism," with "no tangible, cumulative effect on [plaintiff's] status" insufficient).

### 3. Coworker Retaliation Theory

The Sixth Circuit has also recognized a claim for coworker retaliatory harassment, under which an employer is liable for an employee's coworker's actions if (1) the coworker's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination, (2) supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior, and (3) supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances. *Hawkins v. Anheuser Busch, Inc.*, 517 F.3d 321

(6th Cir. 2008).

The Sixth Circuit has not explained whether the term "sufficiently severe" with respect to coworker retaliation is the same as "sufficiently severe" in the context of retaliatory harassment by a supervisor. However, the Sixth Circuit drew the term "sufficiently severe" from the Supreme Court's *Burlington Northern* decision, in which the Court articulated the now-established standard that actionable retaliation requires retaliatory acts that are "sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination." *See Burlington N.*, 548 U.S. at 68; *Owen v. Peake*, No. 3:02CV179, at *6-*7, 2008 WL 4449011 (S.D. Ohio Sept. 26, 2008) (adopting similar interpretation of *Hawkins* and *Burlington*). This standard requires a plaintiff to demonstrate "material adversity," meaning "significant" rather than "trivial" harm. *Burlington N.*, 548 U.S. at 68.[11]

*Hawkins* is instructive as to the types of conduct that are "sufficiently severe." There, the plaintiff employee had reported to her employer that her supervisor was sexually harassing her. *Id.* at 329. Someone then set fire to the plaintiff's car under circumstances suggesting that it was likely the supervisor who committed the act, the supervisor was overheard threatening to the "kill that bitch" (*i.e.*, the plaintiff) if he lost his job as a result of her complaint, and another female employee's tires were slashed by that supervisor, who then bragged that he had slashed

---

[11]The standards applicable to coworker retaliatory harassment claims in the Sixth Circuit are not crystal clear. Some district courts have analyzed coworker retaliatory harassment claims under the same standard applicable to a traditional sexual harassment claim, while others seem to have analyzed it under a traditional "adverse action" standard. *Compare Moore v. Abbott Labs.*, 780 F. Supp. 2d 600, 623 (S.D. Ohio 2011) (applying adverse action standard) *with Owen*, 2008 WL 4449011, at *6 (applying hostile work environment standard); *see also Rodriguez-Monguio v. Ohio State Univ.*, Civil Action No. 2:08-cv-00139, 2011 WL 335854, at *18 (S.D. Ohio Jan. 31, 2011) (referencing both standards).

her tires to "repay the woman for telling on him." *Id.* at 329 and 347-348. The employer failed to respond to these chilling allegations in any meaningful way – it did not investigate the employee's reports, monitor the supervisor, or create a safe environment for harassment complaints. *Id.* at 348. Under the circumstances, the Sixth Circuit found that the employee had made out her *prima facie* case.

Here, as discussed in the previous two sections, Reeves' complaints about coworker conduct were far less serious than those at issue in *Hawkins*, and concerned conduct that would not dissuade a reasonable worker from filing or supporting a charge of discrimination. Indeed, district courts applying *Hawkins* have found that allegations of coworker harassment more serious than those presented here failed to meet the plaintiff's *prima facie* burden. *See, e.g.*, *Owen*, 2008 WL 4449011, at *6-*8.[12]

## CONCLUSION

For the reasons stated herein, TFMIC's Motion for Summary Judgment will be granted. An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[12]Furthermore, even if Reeves had met this aspect of her *prima facie* burden, Reeves has not shown that TFMIC's responses to her complaints were inadequate. Bowling investigated Reeves' complaints about coworker conduct, and the record shows that Delk generally sought to address Reeves' complaints about her coworkers, at least in those instances when she articulated specific grievances.